Slip Op. 17-95

UNITED STATES COURT OF INTERNATIONAL TRADE

MOREX RIBBON CORP., PAPILLON RIBBON AND BOW INC., AND AD-TECK RIBBON, LLC,

          Plaintiffs,

    v.

UNITED STATES,

          Defendant.

**PUBLIC VERSION**

Before: Leo M. Gordon, Judge

Court No: 15-00141

**OPINION**

[Commerce's final results sustained.]

Dated: August 1, 2017

<u>Jonathan M. Zelinski</u>, Cassidy Levy Kent (USA) LLP of Washington, DC argued for Plaintiffs Morex Ribbon Corp., Papillon Ribbon and Bow Inc., and Ad-Teck Ribbon, LLC (dba Wrap Ribbon). With him on the briefs were <u>James R. Cannon, Jr.</u> and <u>Ulrika K. Swanson</u>.

<u>Kara M. Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, and <u>Renée Gerber</u>, Trial Attorney. Of counsel was <u>Amanda T. Lee</u>, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

<u>Gregory C. Dorris</u>, Pepper Hamilton LLP of Washington, DC argued for Defendant-Intervenor Berwick Offray LLC.

Gordon, Judge: This action involves the third administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering narrow woven ribbons with woven selvedge ("NWR") from Taiwan. <u>See</u> <u>Narrow Woven Ribbons with Woven Selvedge from Taiwan</u>, 80 Fed. Reg. 19,635 (Dep't of Commerce Apr. 13, 2015) (final results of admin. review), ECF No. 19-4 ("<u>Final Results</u>"), and

accompanying <u>Issues and Decision Mem. for the Final Results of the Antidumping Duty Admin. Rev. on Narrow Woven Ribbons with Woven Selvedge from Taiwan</u>, A-583-844 (Dep't of Commerce Apr. 6, 2015) ("<u>Decision Mem.</u>"), ECF No. 19-5.

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record of Plaintiffs Morex Ribbon Corp., Papillon Ribbon and Bow Inc., and Ad-Teck Ribbon, LLC (collectively, "Plaintiffs" or "Morex"). <u>See</u> Pls.' R. 56.2 Mem. Supp. Mot. J. Agency R., ECF No. 23 ("Morex Br."); <u>see also</u> Def.'s Opp'n Pls.' Mot. J. Admin. R., ECF No. 29 ("Def.'s Resp."); Def.-Intervenor Berwick Offray LLC's Opp'n Pls.' Mot. J. Admin. R., ECF No. 33; Pls.' Reply Br. Supp. Mot. J. Agency R., ECF No. 37 ("Morex Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

## I. Background

Plaintiffs imported NWR from Hen Hao Trading Co. Ltd. a.k.a. Taiwan Tulip Ribbons and Braids Co. Ltd. ("Hen Hao"), a producer of NWR from Taiwan, during the period of review ("POR"). Each plaintiff paid cash deposits at the rate of 4.37%—the rate required by Commerce at the time of entry. Compl. ¶ 7. Commerce identified Hen Hao and another Taiwanese producer of NWR, King Young Enterprises Co., Ltd., along with King Young's affiliates, Ethel Enterprise Co., Ltd. and Glory Young Enterprise Co., Ltd. (collectively "King Young"), as mandatory respondents in the administrative review and

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

forwarded questionnaires to them. See Narrow Woven Ribbons with Woven Selvedge from Taiwan, 79 Fed. Reg. 60,449 (Dep't of Commerce Oct. 7, 2014) (prelim. results), PD 86[2]; see also Decision Mem. for the Prelim. Results of the Admin. Rev. of the Antidumping Duty Order on Narrow Woven Ribbons with Woven Selvedge from Taiwan, A-583-844 (Dep't of Commerce Sept. 25, 2014), PD 87.

King Young cooperated with Commerce during the administrative review and received a calculated rate of 30.64%. Final Results, 80 Fed. Reg. at 19,636. Hen Hao, on the other hand, withdrew from the review without submitting any information. See Hen Hao's Notice of Withdrawal, PD 25 at bar code 3186563-01 (Mar. 7, 2014). Consequently, Commerce applied facts available with an adverse inference [3] and assigned Hen Hao a total adverse facts available ("AFA") rate of 137.20%—the highest rate alleged in the petition ("Petition Rate"). Decision Mem. at 34.

In this action Plaintiffs challenge the assignment of the Petition Rate to Hen Hao. For the reasons set forth below, the court sustains Commerce's determination.

---

[2] "PD" refers to a document contained in the public administrative record, which is found in ECF No. 19-1, unless otherwise noted. "CD" refers to a document contained in the confidential administrative record, which is found in ECF No. 19-2, unless otherwise noted.

[3] Under 19 U.S.C. § 1677e(a)(2), if Commerce finds that a respondent's information is unreliable because the respondent has withheld information that Commerce requests, failed to provide requested information in a timely manner or in the form or manner requested, or significantly impeded the progress of the proceeding, Commerce is required to calculate that respondent's margin using the facts otherwise available. Having decided to apply facts available, Commerce then may draw an adverse inference against a respondent in selecting from among the facts otherwise available when it finds that a respondent "has failed to cooperate by not acting to the best of its ability." 19 U.S.C. § 1677e(b).

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A, West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

### III. Discussion

In a total AFA scenario Commerce typically cannot calculate an antidumping rate for an uncooperative respondent because the information required for that calculation was not provided. As a substitute, Commerce relies on other sources of information ("secondary information"), e.g., the petition, the final determination from the investigation, prior administrative reviews, or any other information placed on the record, 19 U.S.C. § 1677e(b), to select a proxy that should be a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." F.lli de Cecco di Filippo Fara S. Martino S.p.A. v United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

When selecting an appropriate AFA proxy, Commerce's general practice is to choose the higher of (1) the highest rate alleged in the petition or (2) the highest margin rate calculated in any segment of the proceeding, "unless these rates cannot be corroborated or there are case-specific reasons that these rates are not acceptable." Decision Mem. at 39 (citations omitted). The proxy's purpose "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." de Cecco, 216 F.3d at 1032. Although a higher AFA rate creates a stronger incentive to cooperate, "Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citing de Cecco, 216 F.3d at 1032); see also Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004) ("Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing

compliance."). Commerce must select a rate that is a "'reasonably accurate estimate of the respondent's actual rate,'" Gallant Ocean, 602 F.3d at 1323 (quoting de Cecco, 216 F.3d at 1032), and has "some grounding in commercial reality." Id. at 1324; see also Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1344 (Fed. Cir. 2016).[4]

Commerce, to the extent practicable, must corroborate secondary information with independent sources reasonably at its disposal. 19 U.S.C. § 1677e(c). In practice, "corroboration" involves confirming that secondary information has "probative value," 19 C.F.R. § 351.308(d) (2014), by examining its "reliability and relevance." Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007) (citing Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712–13 (Dep't of Commerce Sept. 16, 2005) (final results admin. revs.)).

## A. AFA Rate Selection

In the Final Results Commerce considered the following choices for an AFA rate for Hen Hao: (1) the Petition Rate of 137.20% (the highest rate alleged in the petition); (2) 4.37% (the only affirmative dumping margin calculated in the less than fair value investigation); (3) 30.64% (the weighted-average margin calculated for King Young in the

---

[4] The court notes that Congress amended the antidumping duty statute to eliminate the requirement that a total AFA proxy reflect a respondent's "commercial reality." See Trade Preferences Extension Act of 2015. Pub.L. No. 114–27, 129 Stat. 362 (2015). "Commerce is . . . no longer required to tie an AD duty margin to the 'commercial reality' of the interested party." Fresh Garlic Producers Association v. United States, 39 CIT ___, 121 F. Supp. 3d 1313, 1329 (2015). That amended provision does not apply to this action.

current segment of the proceeding); and (4) various margins calculated using a subset of King Young's data. Decision Mem. at 39. In selecting an AFA rate for Hen Hao, Commerce determined that the Petition Rate was the only rate that was sufficient to deter non-compliance. Id. Commerce reasonably determined that the 4.37% rate would not sufficiently deter non-compliance because it is Hen Hao's current cash deposit rate and "at this rate Hen Hao's NWR has continued to be imported into the United States." Id. (citing Mem. Regarding Release of Customs Entry Data from U.S. Customs and Border Protection, PD 6 at bar code 3164169-01, CD 1 at bar code 3164167-01 (Nov. 19. 2013)). Commerce also reasonably determined that the 30.64% rate would not deter non-compliance because it was the actual calculated dumping rate assigned to King Young, the sole cooperative respondent for the POR. Id. Additionally, Commerce declined to choose a rate calculated using a subset of King Young's data, finding that use of a contemporaneous rate calculated for a cooperative respondent "would be at odds with the statutory purpose of AFA to induce cooperative behavior." Id. at 40. That left the Petition Rate of 137.20%.

Plaintiffs contend that the AFA rate is unreasonably high because as independent importers they will be responsible to pay the increased duties, even though they had no control over Hen Hao's decision to withdraw from the administrative review. Morex Br. 9. This very scenario was alluded to by the U.S. Court of Appeals for the Federal Circuit in KYD, Inc. v. United States, 607 F.3d 760 (Fed. Cir. 2010). There, plaintiff KYD, an independent U.S. importer of polyethylene retail carrier bags, challenged Commerce's assignment of the petition rate, as AFA, to an uncooperative foreign producer and

exporter of the subject merchandise. KYD argued that "Commerce should apply AFA rates only against uncooperative parties" and that "a cooperative, independent importer should not be required to pay an assessment based on an AFA dumping margin imposed on an uncooperative producer/exporter." Id. at 768.

The Federal Circuit rejected KYD's argument because it "would allow an uncooperative foreign exporter to avoid the adverse inferences permitted by statute simply by selecting an unrelated importer, resulting in easy evasion of the means Congress intended for Commerce to use to induce cooperation with its antidumping investigations." Id. The court also recognized that in some cases "domestic importers will have to pay enhanced antidumping margins because of the uncooperativeness of the exporters from whom they purchase goods," and that the possibility that U.S. importers would have to pay increased duties was consistent with the intent behind the statute permitting the use of AFA. Id. ("In the aggregate, . . . the importers' exposure to enhanced antidumping duties seems likely to have the effect of either directly inducing cooperation from the exporters with whom the importers deal or doing so indirectly, by leaving uncooperative exporters without importing partners who are willing to deal in their products."). Therefore, the possibility that Plaintiffs as domestic (U.S.-based) importers may bear contingent liability resulting from the uncooperative behavior of its unaffiliated exporter cannot invalidate Commerce's AFA rate selection.

Next, Plaintiffs argue that Commerce unreasonably failed to consider as a mitigating factor Hen Hao's reasons for failing to comply with Commerce's requests for information. Morex Br. 12. Specifically, Morex contends that Hen Hao's failure to comply

was not the result of a business decision that Hen Hao would gain a better or equivalent

rate by not cooperating. Rather the burden of responding to those requests was "simply

beyond the capabilities of [Hen Hao's] employees." Id. (quoting Hen Hao's Notice of

Withdrawal at 1-2, PD 25 at bar code 3186563-01 (Mar. 7, 2014)). Unfortunately for

Plaintiffs, "section 1677e(b) does not by its terms set a 'willfulness' or 'reasonable

respondent' standard, nor does it require findings of motivation or intent. Simply put,

there is no mens rea component to the section 1677e(b) inquiry." Nippon Steel Corp.v.

United States, 337 F.3d 1373, 1383 (Fed. Cir. 2003).

   Finally, Plaintiffs contend that to calculate a non-punitive rate that represents the

uncooperative respondent's commercial reality Commerce must use a cooperative

respondent's rate from the same POR, or a nearby period, as a baseline and add a

premium for deterrent effect. Morex Br. 10-11 (citing Lifestyle Enter., Inc. v. United States,

36 CIT ___, ___, 844 F. Supp. 2d 1283 (2012) ("Lifestyle Enterprise I"); Lifestyle Enter.

Inc. v. United States, 36 CIT ___, 865 F. Supp. 2d 1284 (2012) ("Lifestyle Enterprise II");

Gallant Ocean, 602 F.3d 1319; Dongguan Sunrise Furniture Co. v. United States, 39 CIT

___, 2015 WL 179003 (Jan. 14, 2015) ("Dongguan Sunrise Furniture IV")). The court

disagrees.

   Plaintiffs maintain that the appropriate baseline for Hen Hao's AFA rate is one

derived from the rates calculated for cooperative respondents—0% and 4.37% in prior

segments and 30.64% in this segment. Based on those rates, Morex contends that

Commerce's selection of the Petition Rate is unsupported by the record. In particular,

Plaintiffs argue that the Petition Rate is over 4.5 times higher than the highest calculated

rate, and therefore is unnecessarily punitive, i.e., more than a mere deterrent. Citing Dongguan Sunrise Furniture I, 37 CIT ___, ___, 931 F. Supp. 2d. 1346, 1355 (2013), Plaintiffs also argue that Commerce failed to explain its rationale for selecting the Petition Rate and why a lower rate—somewhere above 30.64% and below 137.20%— would not provide a sufficient deterrent.

The court disagrees. In Lifestyle Enterprise I, the court rejected the AFA rate because the rate was "an extreme outlier" when viewed in light of the prior reviews and because the record suggested that the uncooperative respondent's commercial reality "differ[ed] significantly" from the respondent in the review from which the AFA rate was taken. Lifestyle Enterprise I, 36 CIT at ___, 844 F. Supp. 2d at 1291. In contrast, in this action, the Petition Rate was not an "extreme outlier" as Commerce used that rate in the first and second administrative reviews. The first administrative review was challenged, and this Court sustained Commece's use of the Petition Rate. Hubscher Ribbon Corp. v. United States, 37 CIT ___, 942 F. Supp. 2d 1375 (2013). Additionally here, unlike in Lifestyle Enterprise I, Commerce tied the Petition Rate to Hen Hao's commercial reality. Specifically, Commerce found that Hen Hao supplied NWR to a Canadian reseller who was assigned the Petition Rate as AFA in the first administrative review. Decision Mem. at 42.

Plaintiffs' reliance on Lifestyle Enterprise II is also misplaced. There the court held that the AFA rate used in that case was based on "an impermissibly small percentage" of sales and that the transactions selected by Commerce were "outside of the mainstream." Lifestyle Enterprise II, 865 F. Supp. 2d at 1290. In reaching its holding,

the court stated that the case was "[u]nlike cases in which the rate and amount of deterrent were facially within the bounds of commercial reality." <u>Id.</u> at 1292. Here, Commerce corroborated the Petition Rate using King Young's margins. These margins represented a significant number of King Young's U.S. sales of products within the range of the mainstream products sold by King Young during the POR.[5] <u>Decision Mem.</u> at 44.

Similarly, the circumstances in the <u>Dongguan Sunrise Furniture</u> cases are distinct from those in this action. The question before the court in <u>Dongguan</u> was whether a partial AFA rate assigned to a mostly-cooperating respondent reflected that company's commercial reality. <u>See</u> <u>Dongguan Sunrise Furniture IV</u>, 39 CIT at ___, 2015 WL 179003, at * 4. Although the court remanded the underlying decision to Commerce, it did so out of a concern that Commerce failed to account for "the large variety of individual products and dumping margins reflected in [the respondent's] reported sales . . . ." <u>Id.</u> In contrast, here, Hen Hao did not report any sales data for the POR.

Lastly, <u>Gallant Ocean</u> is also distinguishable. In <u>Gallant Ocean</u>, the Federal Circuit rejected Commerce's use of the highest dumping margin stated in the petition as AFA because the rate could not be corroborated when viewed in the context of the facts of that record. <u>See</u> <u>Gallant Ocean</u>, 602 F.3d at 1324-25. Here, on the other hand, Commerce

---

[5] Commerce found that [[    ]] transaction-specific margins, or [[       ]] of King Young's transactions, were higher than the Petition Rate. <u>See</u> Corroboration of Adverse Facts Available Rate for the Final Results at 1, CD 122 at bar code 3269505-01 (Apr. 6, 2015).

corroborated the Petition Rate, establishing a link between the rate and Hen Hao's commercial reality. See infra.

## B. Corroboration

To corroborate the 137.20% rate, Commerce reviewed transaction-specific margins submitted by King Young regarding hundreds of U.S. sales of NWR during the POR. Decision Mem. at 41. Plaintiffs do not question Commerce's use of King Young's sales data to corroborate the Petition Rate. Rather, Plaintiffs argue that Commerce used an insufficient number of transaction-specific margins calculated for King Young. Morex Br. 15-16. The court does not agree. The administrative record supports Commerce's finding that a substantial number of King Young's actual U.S. transactions were dumped at rates "at an even higher level than [the Petition Rate]."[6] Commerce found that King Young's sales represented "numerous models and thousands of spools, at rates equaling or exceeding the [P]etition [R]ate." Decision Mem. at 41. These sales "were not isolated sales of unusual models, but rather they [fell] well within the range of the mainstream products sold by King Young during the POR." Id.; see KYD, 607 F.3d at 767 (Commerce may use cooperative companies' transaction-specific margins to support an AFA rate when that rate is within the range of actual selling prices). Consequently, Commerce determined that King Young's sales data provided a reasonable basis to corroborate the Petition Rate and determined that the Petition Rate was "neither aberrational nor divorced from commercial reality." Decision Mem. at 41.

---

[6] See footnote 5 supra.

Commerce also corroborated the Petition Rate based on other record evidence, concluding that the Petition Rate was relevant and reliable. Commerce determined that the Petition Rate was relevant to Hen Hao in that King Young, who, like Hen Hao, is a Taiwanese producer/exporter selling NWR to the United States, was found to be dumping NWR at rates similar to, or higher than, the Petition Rate during the POR. Decision Mem. at 42. Commerce noted that Plaintiffs themselves recognized that "Hen Hao's commercial reality is linked to King Young's, given that [the importers] suggest various alternative AFA rates which are derived from King Young's data," and that "in every segment of this proceeding, [Commerce has] found that NWR produced in Taiwan and exported to the United States [was] being dumped in rates exceeding 100 percent." Id.; see Narrow Woven Ribbons with Woven Selvedge from Taiwan, 77 Fed. Reg. 72,825 (Dep't of Commerce Dec. 6, 2012) (final results first admin. rev.) (dumping margin of 137.20%); Narrow Woven Ribbons with Woven Selvedge from Taiwan, 78 Fed. Reg. 50,377 (Dep't of Commerce Aug. 19, 2013) (final results second admin. rev.) (same). Additionally, Commerce determined that the Petition Rate was relevant to Hen Hao because Hen Hao previously supplied NWR to a Canadian reseller who Commerce found to be dumping at the 137.20% rate in the first administrative review, Decision Mem. at 42, and the application of this rate to the Canadian reseller was ultimately sustained, see Hubscher Ribbon, 37 CIT ___, 942 F. Supp. 2d 1375.

Lastly, Commerce determined that the Petition Rate of 137.20% rate continued to be reliable. Decision Mem. at 42. Given the absence of any information on the record to the contrary, no basis exists to conclude that Commerce's determination was

unreasonable. <u>See</u> <u>id.</u> (noting there was "no evidence on the record that Hen Hao [did] not continue to sell dumped NWR to the United States . . . ."). Therefore, Commerce's corroboration of the Petition Rate as relevant and reliable is supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the court sustains Commerce's assignment of an AFA rate based on the Petition Rate to Hen Hao. Judgment will be entered accordingly.


                                                            /s/ Leo M. Gordon
                                                         Judge Leo M. Gordon


Dated: August 1, 2017
        New York, New York